UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-80038-CR-CANNON/MCCABE

18 U.S.C. § 371
18 U.S.C. § 982

FILED BY _____MP_____ D.C.
Mar 19, 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

v.

ROBERT MATTHEW CLARK,

    Defendant.
_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

### The Medicare Program

1.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.    Medicare was subdivided into multiple program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care. Medicare Part C, also

known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations.

3. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and Title 42, United States Code, Section 1320a-7b(f).

4. Laboratories, pharmacies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit a Medicare enrollment application, which required providers to certify that they would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, Title 42 United States Code, Section 1320a-7b(b).

5. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. To receive payment from Medicare, providers submitted or caused the submission of claims to CMS that were required to set forth, among other information, the Medicare beneficiary's name and unique Medicare beneficiary identification number, the item or service provided to the beneficiary, the date the item or service was provided, and the cost of the item or service. CMS Form 855 contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

6. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

7. Medicare reimbursed providers for items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare electronically, either directly or through a billing company.

8. Medicare would not reimburse providers for claims for items or services that were procured in violation of the Federal Anti-Kickback Stature, including the provision prohibiting the purchase, sale, and distribution of Medicare beneficiary identification numbers.

**Genetic Testing**

9. Genetic tests were laboratory tests designed to identify specific inherited mutations in a patient's genes.

10. Genetic tests related to a patient's hereditary predisposition to cancer were commonly referred to as "CGx" tests. These tests used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

11. In order to have a genetic test performed, an individual provided a saliva sample using a buccal (cheek) swab, which collected a specimen containing DNA material. The sample was then transmitted to a laboratory for testing.

12. Medicare did not cover diagnostic testing that was not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 U.S.C. § 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests."

3

*Id.*

13. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposed additional regulations before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided that "all diagnostic x-rays tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, a physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

## Medicare Beneficiary Identification Numbers

14. Each Medicare beneficiary was identified with a unique beneficiary identification number. These beneficiary identification numbers were used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. Health Insurance Claim Numbers ("HICNs") and Medicare Beneficiary Identifiers ("MBIs") were two types of Medicare beneficiary identification numbers.

15. In 2015, CMS began to assign Medicare beneficiaries MBIs, which were comprised of a unique series of eleven randomly generated numbers and letters. MBIs, like HICNs, were used to identify qualifying beneficiaries in all Medicare transactions such as billing and claim submissions. One purpose of using this randomly generated series of numbers and letters was to improve patient identity protection and prevent identify theft. According to CMS, personal identity theft affected a large and growing number of senior citizens. CMS implemented the new MBIs in an effort to combat identity theft and safeguard taxpayer dollars.

**Over-the-Counter COVID-19 Tests**

16. Starting on April 4, 2022, and continuing through the end of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter COVID-19 tests at no cost to beneficiaries with Medicare Part B, including those with Medicare Advantage plans. This program was intended to ensure Medicare beneficiaries had access to COVID-19 tests they needed to stay safe and healthy during the COVID-19 pandemic. Eligible providers capable of providing ambulatory health care services were permitted to distribute to Medicare beneficiaries over-the-counter COVID-19 tests that were approved, authorized, or cleared by the United States Food and Drug Administration.

17. Medicare would not pay for more than eight over-the-counter COVID-19 tests per calendar month per Medicare beneficiary. Providers could distribute over-the-counter COVID-19 tests to Medicare beneficiaries who requested them. Providers were required to keep documentation showing a Medicare beneficiary's request for the tests.

18. Medicare did not cover over-the-counter COVID-19 tests billed by durable medical equipment suppliers or providers who distributed over-the-counter COVID-19 tests to Medicare beneficiaries during an inpatient stay at a hospital or skilled nursing facility.

**The Defendant, Related Entities, and Relevant Person**

19. Defendant **ROBERT MATTHEW CLARK ("CLARK")** was a resident of Palm Beach County, in the Southern District of Florida.

20. Individual 1, a co-conspirator not charged in this Information, was a resident of Palm Beach County, in the Southern District of Florida.

21. Clear Choice Diagnostics Inc. ("Clear Choice") was a company formed under the laws of Florida with a principal address of 3839 NW 2nd Ave, Suite 200, Boca Raton, Florida 33487 in Palm Beach County. **CLARK** was an owner of Clear Choice.

22. Marketing Company 1 was a company formed under the laws of Florida that arranged for the ordering of genetic tests and over-the-counter COVID-19 tests.

**Conspiracy to Defraud the United States, Pay Health Care Kickbacks, and Purchase MBIs (18 U.S.C. § 371)**

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around May 2022, and continuing through in or around May 2023, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERT MATTHEW CLARK,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Individual 1 and others known and unknown to the United States Attorney, to commit offenses against the United States, that is:

a. to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of Medicare;

b. to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service,

and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and

c. to violate Title 42, United States Code, Section 1320a-7b(b)(4), by purchasing, selling, and distributing, and arranging for the purchase, sale, and distribution, of Medicare beneficiary identification numbers, that is, HICNs and MBIs.

**Purpose of the Conspiracy**

3. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying kickbacks and bribes to purported marketing companies in exchange for the referral of Medicare beneficiaries for genetic testing, without regard to whether the beneficiaries needed the genetic testing or whether the genetic testing was eligible for reimbursement by Medicare; (b) purchasing, selling, and distributing Medicare beneficiary information, including beneficiary names, dates of birth, social security numbers, HICNs, and MBIs, without lawful authority; (c) submitting and causing the submission of false and fraudulent claims to Medicare for over-the-counter COVID-19 tests that were not requested by beneficiaries and ineligible for Medicare reimbursement; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**Manner and Means of the Conspiracy**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4. **ROBERT MATTHEW CLARK** caused Clear Choice to become enrolled as a Medicare provider. As part of the enrollment application, **CLARK** certified, among other things, that Clear Choice would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

7

5. **CLARK** and his co-conspirators caused the payment of illegal kickbacks and bribes to Marketing Company 1 and others in exchange for referrals of Medicare beneficiaries for genetic testing and over-the-counter COVID-19 tests.

6. **CLARK** and his co-conspirators purchased Medicare beneficiary information, including beneficiary names, dates of birth, social security numbers, HICNs, and MBIs, without lawful authority, from Marketing Company 1 and others.

7. **CLARK** and his co-conspirators caused genetic testing kits and over-the-counter COVID-19 test kits to be shipped to the Medicare beneficiaries identified by Marketing Company 1 and others.

8. **CLARK** and his co-conspirators caused Clear Choice to submit more than $30 million in false and fraudulent claims to Medicare for genetic testing and over-the-counter COVID-19 tests that were ineligible for reimbursement. Medicare paid more than $15 million based on those claims.

9. **CLARK** and his co-conspirators used the fraud proceeds to benefit themselves and others, and to further the fraud.

**Overt Acts**

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1. On or about August 31, 2022, **CLARK** submitted and caused to be submitted a Medicare enrollment application for Clear Choice that falsely identified **CLARK** as the sole owner and managing member.

2. On or about December 12, 2022, **CLARK** sent and caused to be sent a wire

payment to Marketing Company 1 in the amount of $110,000.

3. On or about January 13, 2023, **CLARK** sent and caused to be sent a wire payment to Marketing Company 1 in the amount of $110,000.

4. On or about January 31, 2023, **CLARK** sent and caused to be sent a wire payment to Marketing Company 1 in the amount of $110,000.

5. On or about February 15, 2023, **CLARK** sent and caused to be sent a wire payment to Marketing Company 1 in the amount of $110,000.

6. On or about March 1, 2023, **CLARK** sent and caused to be sent a wire payment to Marketing Company 1 in the amount of $175,000.

7. On or about March 15, 2023, **CLARK** sent and caused to be sent a wire payment to Marketing Company 1 in the amount of $175,000.

All in violation of Title 18, United States Code, Section 371.

## **FORFEITURE ALLEGATIONS**

1. The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **ROBERT MATTHEW CLARK**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 371, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

      b. has been transferred or sold to, or deposited with, a third party;

      c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____ for:
MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
S. BABU KAZA
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: 24-80038-CR-CANNON/MCCABE

v.

ROBERT MATTHEW CLARK,

_____/
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
- ☐ Miami
- ☐ Key West
- ☐ FTP
- ☐ FTL
- ☒ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I  ☒ 0 to 5 days
   - II ☐ 6 to 10 days
   - III ☐ 11 to 20 days
   - IV ☐ 21 to 60 days
   - V ☐ 61 days and over

   (Check only one)
   - ☐ Petty
   - ☐ Minor
   - ☐ Misdemeanor
   - ☒ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____
SRIDHAR BABU KAZA
DOJ Trial Attorney
Court ID No.   A5503027

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**

**Defendant's Name**:       **ROBERT MATTHEW CLARK**

**Case No**: _____

Count #:   1

Title 18, United States Code, Section 371

Conspiracy to Defraud the United States, Pay Health Care Kickbacks, and Purchase MBIs
* Max. Term of Imprisonment:   5 years
* Mandatory Min. Term of Imprisonment (if applicable):   N/A
* Max. Supervised Release:   3 years
* Max. Fine:   $250,000 or twice the gross gain or loss resulting from the offense

\*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Robert Matthew Clark,<br>*Defendant* | )<br>)  Case No.<br>)  **24-80038-CR-CANNON/MCCABE**<br>)<br>) |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

JONATHAN FRIEDMAN, ESQ.
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*